MELLOY, Circuit Judge.
Matthew Robinson sued Arkansas State Trooper Stewart Condley under 42 U.S.C. § 1983, alleging Trooper Condley failed to stop another law enforcement officer’s use of excessive force. Trooper Condley filed a motion for summary judgment asserting qualified immunity. The district court denied the motion, holding a jury could find that Trooper Condley violated Matthew Robinson’s clearly established constitutional right to be free from excessive force. Trooper Condley appeals. Because Trooper Condley’s duty to intervene in the circumstances of this case was not clearly established, we reverse.
I
On September 13, 2011, Eva Robinson and her son Matthew Robinson were walking their dog in front of their home. Steven Payton, a part-time Deputy Marshal for the City of Dover Marshal’s Office, observed “suspicious people walking.” He saw one of the suspicious people, Matthew, throw something into the grass. He stopped Matthew and Eva on the sidewalk.[1] Suddenly, the Robinsons’ dog ran away, and Matthew chased it. After Matthew returned with the dog, Deputy Marshal Payton placed Eva, Matthew, and their dog inside his patrol car.
While the Robinsons were inside the patrol car, Kristopher Stevens, a Deputy Sheriff for Pope County, and Stewart Condley, an Arkansas State Trooper, arrived at the scene. After Trooper Cond-ley, Deputy Sheriff Stevens, and Deputy Marshal Payton met briefly to discuss the situation, they walked towards the patrol *827 car. Deputy Sheriff Stevens asked Matthew to exit the patrol car. Matthew did not exit, and Deputy Sheriff Stevens tased Matthew while Matthew was in the backseat.
The parties disagree about what occurred before Deputy Sheriff Stevens tased Matthew. According to the Robin-sons, Matthew was tased while he was struggling to get out of the backseat. Matthew is at least six feet tall and wears a size sixteen shoe. Eva asserts Deputy Sheriff Stevens tased Matthew without warning very shortly after asking Matthew to get out of the car. Matthew asserts that one of the officer’s arms was inside the car as he was attempting to get out, and he reached for the arm for assistance to exit the vehicle. Trooper Condley asserts Matthew refused to exit the vehicle after multiple requests. Trooper Condley also alleges that Deputy Sheriff Stevens told Matthew that if Matthew did not get out of the car, Deputy Sheriff Stevens was going to tase Matthew. Because we are required to view the facts in the light most favorable to Matthew, we accept his version of the events at this stage.
While Deputy Sheriff Stevens was tas-ing Matthew, Eva tried to shield Matthew. In response, Trooper Condley walked around the back of the patrol car, removed Eva from the vehicle, and handcuffed her.
Deputy Marshal Payton then pulled Matthew from the car — on the opposite side of the car from Trooper Condley and Eva — and drive-stunned him at least twice while Matthew was standing. At some point, Deputy Marshal Payton took Matthew to the ground behind the patrol car and drive-stunned Matthew at least twice more. Photos of Matthew from after the altercation show at least fifteen taser marks. Deputy Marshal Payton and Deputy Sheriff Stevens placed Matthew in handcuffs and searched him. The officers found cigarette lighters and an air chuck.
Meanwhile, Trooper Condley was attempting to control Eva on the other side of the car. During this time, Trooper Condley placed Eva in handcuffs on the sidewalk next to the patrol car. Eva thought the officers were shooting her son with a handgun — she was not familiar with tasers. She urinated on herself and screamed for her husband. She wanted to cover Matthew to protect him. Eva later stated that she was willing to give her life to protect her son. Trooper Condley was holding her down so she could not go to Matthew. At one point, she broke free from the handcuffs and moved towards the other officers and Matthew. Trooper Condley grabbed her and slammed her onto the hood of the patrol car. Eva broke the patrol car’s antenna with her hand in an attempt to stabilize herself. Trooper Condley is 6'3" tall and weighs at least 200 pounds. He described Eva as “not very big” and “someone that [he] can handle pretty easily.” Eva and Matthew were then placed back into the police car.[2]
Although three patrol cars were present, only one dash-cam video was produced. The video does not have audio, and a different patrol car blocks the camera for a large portion of the video. A taser stores data regarding the duration and the number of times it was used.[3] Pope County sent the taser to the manufacturer some *828 time after the altercation. The manufacturer lost or destroyed the data.
Eva was charged with disorderly conduct, refusal to submit to arrest, and criminal mischief. Matthew was charged with refusal to submit to arrest. The Pope County Sheriff, Aaron Duvall, investigated Deputy Sheriff Stevens’s actions and decided not to take any disciplinary action. The Marshal for the City of Dover (Rod Pfeifer) investigated Deputy Marshal Pay-ton’s actions and decided not to take any disciplinary action.
The Robinsons sued the City of Dover, the Dover Marshal’s Office, Pope County, and the Pope County Sheriffs Department. They also sued individually and officially Deputy Marshal Payton, Deputy Sheriff Stevens, Trooper Condley, Sheriff Duvall, and Marshal Pfeifer. The Robin-sons alleged violations of their federal and state constitutional rights. They also alleged that the officers violated provisions of the Arkansas Civil Rights Act. They sought damages for common law outrage, abuse of process, battery, and failure to supervise.
Defendants moved for summary judgment. The district court granted some claims and denied others. Relevant to this appeal, the district court denied Trooper Condley’s motion for qualified immunity on the claim that Trooper Condley failed to intervene during the other officers’ use of excessive force against Matthew. The district court held “[tjhough it is undisputed that Condley did not use any force on Matthew, a reasonable juror could find that Condley failed to stop Deputy Sheriff Stevens from continuing to tase Matthew, although he had a duty to do so.” Trooper Condley appeals.
II
We review the denial of summary judgment de novo, construing the evidence in the light most favorable to the nonmov-ing party and drawing all reasonable inferences in his or her favor. Schoelch v. Mitchell, 625 F.3d 1041, 1045 (8th Cir.2010). The movant is entitled to summary judgment if the record presents no genuine dispute as to any material fact and he or she succeeds as a matter of law. Fed.R.Civ.P. 56. Because this is an interlocutory appeal from a denial of qualified immunity, appellate review is limited to the legal question of whether Condley is entitled to qualified immunity. This Court has jurisdiction to review issues of law. Craighead v. Lee, 399 F.3d 954, 960 (8th Cir.2005).
An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmov-ing party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation. See Pearson v. Callahan, 555 U.S. 223, 227, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). We are “permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.” Id. at 236, 129 S.Ct. 808.
In assessing whether a right is clearly established, the Supreme Court has emphasized that we must define the right “in light of the specific context of the case, not as a broad general proposition.” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). “[T]he salient question ... is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional.” Tolan v. Cotton, — U.S. -, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (alterations in original) (citation and internal quo *829 tation marks omitted). As such, qualified immunity “provides ample protection to all but the plainly incompetent or those who knowingly violate the law.” Winters v. Adams, 254 F.3d 758, 766 (8th Cir.2001) (citation omitted); see also Davis v. Hall, 375 F.3d 703, 712 (8th Cir.2004) (“Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.”). Therefore, “existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.” Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (citation and internal quotation marks omitted).
The Eighth Circuit has held that a police officer may be liable if he does not intervene to prevent the use of excessive force when “(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.” Nance v. Sammis, 586 F.3d 604, 612 (8th Cir.2009) (citation omitted).
Matthew argues Trooper Condley is not entitled to qualified immunity because case law clearly established at the time of the incident that an officer may be liable for failing to intervene to prevent the use of excessive force. Trooper Cond-ley argues that he is entitled to qualified immunity for three reasons: first, he did not observe or have reason to know the two other officers were applying excessive force to Matthew; second, he did not have a duty to intervene because he did not have the opportunity and means to do so; and third, the duty to intervene in the specific circumstances of this case — i.e., when occupied with another person on the scene — was not clearly established.
Viewing the evidence in the light most favorable to Matthew and drawing all reasonable inferences in his favor, we cannot say Trooper Condley’s duty to intervene was clearly established in the specific context of this case. Because Trooper Cond-ley’s conduct was arguably reasonable in light of the circumstances, he is entitled to qualified immunity as a matter of law. Eva was under the impression that the officers shot Matthew because she thought the taser was a handgun. She was hysterical and unpredictable while Trooper Condley removed her from the car and attempted to control her. She stated she was willing to give her life to protect Matthew. In addition to urinating on herself, she was screaming for her husband and attempting to join the altercation between Matthew and the other officers. Eva could see the other officers “smushing” Matthew’s face into the gravel. Eva was screaming continuously as Trooper Cond-ley was holding her down and not allowing her to get up. Eva stated that she tried to stand up, and “if I could have stood up and been free, I would have gone to Matthew.”
At one point, Eva broke free from the handcuffs and moved towards the other officers and Matthew. Trooper Condley grabbed her and stopped her from joining the altercation. Trooper Condley slammed Eva onto the front of the squad car and placed her in handcuffs for the second time. At this point, Eva thought the officers were going to kill her in addition to Matthew. After Trooper Condley restrained her for the second time, he placed her into the back seat of Deputy Marshal Payton’s squad car.
The Supreme Court does not permit courts to define clearly established law at high levels of generality; the analysis must take into account the specific facts of each case. Plumhoff, 134 S.Ct. at 2023. The “crucial question is whether the official acted reasonably in the particular circumstances that he or she faced.” Id. We find that a reasonable official, standing in *830 Trooper Condley’s shoes, would not understand that what he is doing — restraining a hysterical individual on the scene and deciding not to leave the hysterical individual and intervene — violates clearly established law. Trooper Condley neither was plainly incompetent nor did he knowingly violate the law. His decision to stay with Eva and not to intervene did not transgress a bright line. If he left Eva, she could have and likely would have joined the altercation, possibly harming herself or others.[4]
Matthew’s reliance on Nance v. Sammis and Krout v. Goemmer is unpersuasive. In both cases, officers failed to intervene. In those cases, however, the officers were not occupied with another individual on the scene — let alone one who was hysterical. See Nance, 586 F.3d at 611-12; Krout v. Goemmer, 583 F.3d 557, 566 (8th Cir.2009) (noting a witness stated several officers were standing around and watching other officers apply excessive force). Here, Trooper Condley was engaged with a volatile individual. Neither Nance nor Krout put Trooper Condley on notice that his actions violated clearly established law.
III
Because we do not find it would be clear to a reasonable officer, standing in the shoes of Trooper Condley, that his conduct was unlawful in the present case, Trooper Condley is entitled to qualified immunity. The district court’s denial of qualified immunity is reversed.

. Deputy Marshal Payton later searched the area but could not find the object. The present appeal involves only the claim against Trooper Condley and does not involve the question of whether reasonable suspicion or probable cause justified the initial stop.

. We note this appeal does not involve any issues of alleged excessive force by Trooper Condley against Eva Robinson; rather, this appeal involves only Trooper Condley's duly to stop the alleged excessive force by others against Matthew Robinson.

. In Deputy Sheriff Stevens’s Incident Report, he stated that Matthew was tased only three times. Deputy Sheriff Stevens later admitted that he tased Matthew at least six times.

. The dissent indicates that questions remain about whether the repeated tasing which caused Matthew’s injuries were justified. We agree. Our opinion does not address, and certainly does not decide, whether Matthew's rights were violated by the repeated tasings. Rather, taking the evidence in the light most favorable to the plaintiffs, and in particular crediting the plaintiffs’ own statements, we conclude that a third-party officer did not violate clearly established constitutional principles by restraining the victim’s mother, who by her own admission was hysterical, and preventing a possible further escalation of a volatile situation.